**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

February 24, 2014

<u>**BY ECF**</u>

The Honorable Robert P. Patterson
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

        Re:    *United States* **v.** *Gupta*,
                  **07 Cr. 177 (RPP)**

Dear Judge Patterson:

        In advance of the March 10, 2014 trial in the above-captioned matter, the Government respectfully moves *in limine* with regard to the following four matters:

        *First*, the Government asks that it be permitted to offer the transcript of the prior testimony of Antonio Fernandes.  As the Court is aware, the defendant is an attorney who was charged in 2007 with causing his clients to make materially false statements in immigration applications for an amnesty program for illegal aliens in 2004-2005 known as "CSS/Newman" or "LULAC" (referred to herein as the "LULAC program"), and with filing those documents with immigration authorities.  The case was tried before the Honorable Deborah A. Batts in 2008.  At trial, the Government offered testimony from, among others, Rehab El Dib, a cooperating witness who made recordings of her meetings with the defendant, as well as from three former clients of the defendant:  Kurshid Alam, Rajesh Bansal, and Antonio Fernandes.  The defendant was convicted, but on appeal the Second Circuit vacated the conviction because, unbeknownst to the Government or the defense, the trial courtroom had been closed to the public during jury selection.

        At the retrial, the Government intends to once again offer live testimony from, among others, El Dib, Alam, and Bansal.  The Government is paying the travel and lodging expenses for Alam and Bansal to travel from Bangladesh and India, respectively, to testify.  The Government had previously contacted Fernandes, who presently lives in Goa, India about testifying at the retrial.  He had agreed to do so.  The Government had obtained authorization for Fernandes to enter the United States, and had arranged for (and was going to pay for) his travel to and from the United States, as well as his lodging.  However, on February 20, 2014, Fernandes informed the Government via email that he would not travel to the United States to testify at the retrial because his brother recently passed away and his mother is in ill health.  The Government has no

Honorable Robert P. Patterson
February 24, 2014
Page 2 of 4

means of compelling Fernandes's testimony.  The Government cannot serve Fernandes with a
trial subpoena in India, s*ee* Fed. R. Crim. P. 17(e)(1) ("A subpoena requiring a witness to attend
a hearing or trial may be served at any place within the United States."), and officials at the
Office of International Affairs ("OIA") of the Department of Justice have informed us that there
is no mechanism for compelling a non-citizen living in India to travel to the United States to
testify. While the Government could send an MLAT request to the Indian government to arrange
for Fernandes's testimony via videoconference, OIA officials have informed us that such a
process could easily take a year, and that India often does not grant such requests.  The
Government thus seeks to introduce Fernandes's 2008 testimony at the retrial.

This testimony is admissible under the Federal Rules of Evidence and the Confrontation
Clause of the United States Constitution.  Rule 804 of the Federal Rules of Evidence provides
that the rule against hearsay does not apply to prior testimony by an unavailable declarant where
the declarant gave the testimony "as a witness at a trial" and it is being "offered against a party
who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect
examination." Fed. R. Evid. 804(b)(1).  A declarant is deemed to be unavailable as a witness
when the declarant "is absent from the trial or hearing and the statement's proponent has not
been able, by process, or other reasons means, to procure the declarant's attendance." Fed. R.
Evid. 804(a)(5)(A).

Fernandes previously testified at trial, and the defendant had a full and fair opportunity to
cross-examine him.  Given that the charge at the retrial is identical to the charge at the first trial,
defense counsel's motive when cross-examining the defendant is no different than it would be at
the retrial.  Moreover, the Government has taken all reasonable steps to obtain Fernandes's
presence at the trial.  Thus, the hearsay rules do not bar the Government from offering
Fernandes's prior testimony.

As for the Confrontation Clause, "testimonial statements of witnesses absent from trial
can be admitted only where the declarant is unavailable, and only where the defendant has had a
prior opportunity to cross-examine." *Williams* v. *Illinois*, 132 S. Ct. 2221, 2232 (2012) (citing
*Crawford* v. *Washington*, 541 U.S. 36, 59 (2004)); *Crawford*, 541 U.S. at 68 ("Where testimonial
evidence is at issue, however, the Sixth Amendment demands what the common law required:
unavailability and a prior opportunity for cross-examination.").  A witness is not unavailable for
purposes of the Confrontation Clause "unless the prosecutorial authorities have made a good-
faith effort to obtain his presence at trial." *Hardy* v. *Cross*, 132 S. Ct 490, 493 (2011) (quoting
*Barber* v. *Page*, 390 U.S. 719, 724-25 (1968)).  However, "the Sixth Amendment does not
require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Id.* at
495.

As described above, despite the Government's good faith efforts, Fernandes is
unavailable to testify at trial.  The defense clearly had a prior opportunity to cross-examine
Fernades.  Indeed, he was cross-examined *in the same case*, regarding the *same charge*, by the
*same defense attorney*.  This is precisely the type of situation in which the Confrontation Clause
permits the admission of prior testimony.

Honorable Robert P. Patterson
February 24, 2014
Page 3 of 4

     *Second*, the Government requests that the defendant be precluded from introducing evidence, or cross-examining witnesses, regarding amnesty programs prior to the LULAC program, or the class action litigation that resulted in the creation of the LULAC program.  The Government intends to offer the testimony of Immigration Services Officer Edward Smith, who will testify from his experience regarding the requirements for eligibility under the LULAC program and regarding the I-687 form that an individual who sought relief under the LULAC program was required to file.  In particular, Officer Smith will testify, in substance and in part, that an individual was only eligible for LULAC relief if, among other things (1) the individual had been residing in the United States illegally prior to 1982; (2) the individual travelled for a short period of time during the 1980s; and (3) the individual applied for relief under a prior amnesty program between May 1987 and May 1988, but was rejected because of the individual's prior travel outside the United States.  This information regarding the LULAC program provides context for the lies that the defendant is alleged to have supplied to his clients so that they would appear eligible for relief under the LULAC program.

     Of course, the Government has no objection to defense counsel cross-examining Officer Smith regarding his understanding of the LULAC program.  Nor does the Government have any objection to the defense offering its own evidence regarding the requirements of the LULAC program or the substance of the I-687 form.  However, in the prior trial in this matter before Judge Batts, defense counsel sought to cross examine a Government witness (a different Immigration Services Officer) regarding prior iterations of the amnesty program.  Defense counsel also sought to cross-examine that witness regarding the class action lawsuits that resulted in the creation of the LULAC program (class action lawsuits were filed regarding the application of the amnesty program in 1987-1988, and the settlement of that litigation resulted in the LULAC program).  Judge Batts precluded defense counsel from cross-examination on these issues because they are irrelevant and confusing, and the Government asks that the Court do the same.  *See* Tr. 83 ("[T]he lawsuit does not get in before the jury."); Tr. 90 ("I don't want you going into a period of time that is not relevant.") (The transcript pages are attached hereto as Exhibit A).  The nature of the amnesty program available to illegal aliens during the 1980s, or the iterations of various amnesty programs prior to the LULAC program, or the lawsuits that resulted in the LULAC program, have no bearing whatsoever on the defendant's guilt or innocence.  *See* Fed. R. Evid. 401.  Testimony regarding *other* amnesty programs, or class action lawsuits, will not be probative and will only serve to confuse the jury.  *See* Fed. R. Evid. 403.

     *Third*, the Government asks that the jury not be informed that there was a prior trial of this case.  The fact that there was a previous trial is simply irrelevant, and knowledge that there was a prior trial would confuse the jury and lead them to speculate about why the defendant is being tried twice.  To the extent defense counsel seeks to raise witnesses' prior testimony during cross-examination, the Government asks that defense counsel refer to testimony in a "prior proceeding," rather than a trial.

     *Fourth*, the Government seeks to limit the defendant's cross-examination of a Government witness ("Witness-1") regarding Witness-1's pending asylum application, which

Honorable Robert P. Patterson
February 24, 2014
Page 4 of 4

was first filed in 2012.  This is not a LULAC application, and it is not related to the defendant's testimony, which concerns Witness-1's interactions with the defendant in 2005 and 2006.  The defense will be provided with the asylum application as part of Witness-1's 3500 material.  To the extent that defense counsel has a good faith basis to believe that any particular statements in the asylum application are inaccurate, the Government does not object to cross-examination of Witness-1 regarding the veracity of those statements.

That said, the Government does not believe that the cross-examination of Witness-1 should turn into a broad inquiry regarding Witness-1's eligibility for asylum, which is irrelevant to the issues at hand.  Moreover, even if that line of inquiry were relevant, its probative value is substantially outweighed by the jury confusion that will result from cross-examination regarding a decision—ultimately to be made by an immigration judge—regarding Witness-1's entitlement to relief under a legal standard that is not at issue in this case.  In short, the cross-examination of Witness-1 should not turn into a "mini trial" regarding Witness-1's ability to obtain asylum.  *See, e.g.*, *United States* v. *Peters*, ____ F. App'x ____, 2013 WL 5540075, at *4 (2d Cir. Oct. 9, 2013) (summary order) (district court properly excluded evidence under Rule 403 that was "likely to generate a mini-trial").

                                        ***

For the foregoing reasons, the Government respectfully requests that the Court grant the motions *in limine* sought herein.

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

                  By:    _____/s/_____
                              Lee Renzin / Michael Gerber
                              Assistant United States Attorneys
                              Tel: (914) 993-1959 / (914) 993-1958

cc:    Jeffrey Hoffman, Esq.

# EXHIBIT A

Page 78

[1] A. I'm not certain. I don't have the exact date.

[2] Q. Turning back to Exhibit 3A -- actually let me take you back

[3] to that just briefly. If you could look at 7A, block 43, if

[4] you could read the entirety of that certification?

[5] A. Block 43, signature of person preparing form if other than

[6] applicant. I declare under penalty of perjury that I prepared

[7] this application at the request of the above person. The

[8] answers provided are based on information of which I have

[9] personal knowledge and/or were provided to me by the

[10] above-named person in response to the exact questions contained

[11] on this form.

[12] Q. Thank you. Now turning back to Exhibit 3A, and one

[13] question on this, if you could look at page 12, please.

[14] A. Yes.

[15] Q. Now is this part of the I-687 we were discussing earlier?

[16] A. Yes, this is the supplement.

[17] Q. What's the purpose of this form?

[18] A. To see if the person is eligible for the program.

[19] Q. And I see there are a number of checked boxes. What

[20] happened if an applicant checks the wrong box?

[21] A. Then they would be ineligible.

[22]     MR. RENZIN: If I could have a moment, your Honor.

[23]     THE COURT: You may.

[24]     MR. RENZIN: I have no further questions, your Honor.

[25]     THE COURT: Thank you.

Page 79

[1]     Mr. Hoffman?

[2]     MR. HOFFMAN: Thank you.

[3] CROSS-EXAMINATION

[4] BY MR. HOFFMAN:

[5] Q. You told us initially that the amnesty program grants

[6] illegal aliens the ability to start a process to become legal;

[7] is that correct?

[8] A. Yes.

[9] Q. And the illegal aliens you said who could do this were

[10] people who were in the United States illegally before

[11] January 1, 1982; correct?

[12] A. Correct.

[13] Q. So if they were in the United States illegally on

[14] January 2nd, 1982 are you saying that they could not apply?

[15] A. No. As long as they met the date of January 1st, 1982, if

[16] they weren't illegal as of January the 1st of 1982 then they

[17] could not -- they would not be eligible.

[18] Q. So if a person came to the United States illegally on

[19] January 2nd, 1982, obviously one day after January 1, 1982 and

[20] that is was the first time they came to the United States, that

[21] person by virtue of coming here one day after January 1, 1982,

[22] could not apply for amnesty; correct?

[23] A. Correct.

[24] Q. And all the people who may have come here and been in an

[25] illegal status January 2, 1982, January 3, 1982 or 1983 or

Page 80

[1] 1984, all those people could not apply for the same amnesty as

[2] the people who were here illegally from January 1, 1982 or

[3] before January 1; correct?

[4] A. Counselor, I just want to clarify, they could apply but

[5] they would be ineligible.

[6] Q. That's what I'm saying.

[7] A. Yes.

[8] Q. Anyone could apply.

[9] A. True.

[10] Q. But the law would not allow all those people to get the

[11] amnesty because they came one day or more after January 1,

[12] 1982; correct?

[13] A. That is correct.

[14] Q. And you told us that the service thought there would be

[15] 20,000 applicants under the amnesty program; correct?

[16] A. Correct.

[17]     (Continued on next page)

Page 81

[1] BY MR. HOFFMAN:

[2] Q. And did you see who -- basis for which that determination

[3] was made, upon which that determination was made?

[4] A. Well, over the years, the course of years --

[5] Q. -- sir, my question is, did you see the figures that caused

[6] that estimate to be made?

[7] A. No, I did not.

[8] Q. Well, and would it be accurate to say that you personally

[9] have no knowledge as to whether that is an accurate or

[10] inaccurate estimate for it, not having seen the basis for it?

[11] A. Correct.

[12] Q. In the original law that allowed only people who were in

[13] the country illegally before January 1, 1982 to apply for

[14] amnesty, was there any requirement that any of those people had

[15] to do anything other than be in this country before 19 --

[16] January 1, 1982 in an illegal status?

[17] A. There were -- the law at its inception was divided into two

[18] parts. So there was a whole other group of people who could

[19] qualify for that by being here. However, they were special

[20] agricultural workers. And their requirement was that they work

[21] in some agricultural area for 90-man days.

[22]     Other than that, the other group which we are talking

[23] about now, it was just being here illegally as of January the

[24] 1st of 1982, not having any felony arrests and not having three

[25] misdemeanor arrests.

---

Page 82

[1]  **Q.** And that was it?

[2]  **A.** That was it.

[3]  **Q.** Then you told us there came a point in time, you said,

[4]  where that changed. And the people had to travel outside the

[5]  United States, is that what you said?

[6]  **A.** Yes.

[7]  **Q.** What's the basis for your knowledge -- withdrawn. When did

[8]  that change take place?

[9]  **A.** That change took place -- well, there was a --

[10]  **Q.** -- stay with me.

[11]       You know the date when that change took place?

[12]  **A.** The date it -- it was settled as of January of 2004 and

[13]  February of 2004.

[14]  **Q.** When you say settled, what do you mean by that?

[15]       **THE COURT:** Just a second, come up here.

[16]       (Continued on next page)

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

Page 83

[1]       (At the sidebar)

[2]       **MR. HOFFMAN:** I think he is going to say that there

[3]  was a statute --

[4]       **THE COURT:** -- no, you don't. You are getting into

[5]  the law. If you do this --

[6]       **MR. HOFFMAN:** -- I am not going to.

[7]       **THE COURT:** I am going to really take it out in front

[8]  of the jury.

[9]       **MR. HOFFMAN:** Maybe he can answer the question --

[10]       **THE COURT:** What is the question?

[11]       **MR. RENZIN:** I think my understanding of what he

[12]  answered was that that was the time, 2004, when the amnesty

[13]  program, as it exists now, was put into place. The

[14]  requirements --

[15]       **THE COURT:** Settled. Whenever anybody uses the word

[16]  settled, and I know that there is a lawsuit involved, that is

[17]  what it sounds like what they are going to say. And the

[18]  lawsuit does not get in before the jury.

[19]       So I don't understand the relevance of the question.

[20]       **MR. HOFFMAN:** Is it your Honor's position that I

[21]  should -- that I should not ask him the basis of his knowledge

[22]  for that because he might say it is the result of the lawsuit?

[23]  I just want to know.

[24]       I am trying to find out the basis for his knowledge of

[25]  the things he's testified about. It could be he will say, I

---

Page 84

[1]  got a memo. It could be he will say, I was told it was a

[2]  settlement of the lawsuit. I don't know at what he is going to

[3]  say specifically.

[4]       **MR. BRAUN:** The man works there every day. The basis

[5]  for his knowledge is probably all of those things. It is his

[6]  education on the job about the requirements of the program.

[7]  I'm sure he is briefed about how these rules come into effect

[8]  which, in this instance, it was litigation, settlements of

[9]  litigation.

[10]       He is on the job every day learning the requirements

[11]  of the program. We have cautioned him that we do not want him

[12]  testifying about litigation, results of litigation, or anything

[13]  along those lines. I think he is doing his best not to do

[14]  that. But we don't know where this cross is going. We don't

[15]  know what is going to be elicited because of his understanding

[16]  of the questions.

[17]       **MR. RENZIN:** This program evolved over 20 years.

[18]  There were a series of events, including class actions, and at

[19]  least one statute --

[20]       **MR. BRAUN:** -- we don't want to get into --

[21]       **MR. HOFFMAN:** -- in view of your Honor's ruling, I

[22]  think I know how the ask the question. It won't get into

[23]  anything that has to potentially respond concerning the

[24]  lawsuits. I think I can ask it away from that.

[25]       **THE COURT:** That would be right, Mr. Hoffman.

---

Page 85

[1]       (In open court)

[2]  **BY MR. HOFFMAN:**

[3]  **Q.** I am going to ask you some questions, and if you can answer

[4]  them yes or no, that would helpful.

[5]  **A.** Okay.

[6]  **Q.** Would it be accurate to say that the program, the amnesty

[7]  program that you have just talked about, came into effect in

[8]  approximately 1986?

[9]  **A.** Correct.

[10]  **Q.** And would it be accurate to say that the time period you

[11]  are talking about, in terms of the filing of the documents that

[12]  you described earlier, were filed in, between mid 2004 and the

[13]  end of 2005?

[14]  **A.** Correct.

[15]  **Q.** So there was approximately an 18-year period between the

[16]  time it came into existence in '86 and the filing of these

[17]  documents, starting in mid 2004, correct?

[18]  **A.** Correct.

[19]  **Q.** Would it be accurate to say that during that 18-year

[20]  period, there were a number of changes that came into effect in

[21]  terms of what applicants had to show in order to successfully

[22]  apply, to be approved in the program?

[23]  **A.** Correct.

[24]  **Q.** And would it be accurate to say, from your experience, that

[25]  during that 18-year program -- I'm sorry, during that 18-year

---

Page 86

[1] period, with the many different changes, there was a fair
[2] degree of confusion at different times as to what specifically
[3] did or did not have to be shown?
[4]       MR. BRAUN: Objection.
[5]       THE COURT: Objection sustained as to form.
[6] Q. During that 18-year time period, would it be accurate to
[7] say that you observed times when there was confusion based on
[8] the different changes in the program's requirements?
[9]       THE COURT: Confusion of whom?
[10] Q. Applicants.
[11]       MR. BRAUN: Objection; foundation.
[12]       THE COURT: Well, he can answer that, if you can.
[13] A. There was a lot of confusion.
[14] Q. Now, would it be accurate to say that at a point in time,
[15] people who left the United States -- withdrawn. Would it be
[16] accurate to say that people who were illegal aliens, who left
[17] the United States and came back illegally, were not allowed to
[18] successfully apply? Could not successfully apply for
[19] the amnesty?
[20] A. Yes.
[21] Q. Would it be accurate to say that there came points in time
[22] with people who left the United States --
[23]       THE COURT: -- you want to approach?
[24]       MR. BRAUN: Yes, please, your Honor.
[25]       THE COURT: I am sorry to interrupt you.

Page 87

[1]       (At the sidebar)
[2]       THE COURT: Mr. Braun?
[3]       MR. BRAUN: Yes, thank you, your Honor.
[4]       The requirement that Mr. Hoffman is referring to in
[5] these questions existed during the later period of the program,
[6] before '06. It did not exist during the earlier period, so I
[7] think the question is a bit unfair in that regard. Did you
[8] have to leave illegally and come back. I think the question
[9] should specify the time period of the program, or else it is
[10] not helpful to the witness.
[11]       THE COURT: It is not helpful to the jury either. Are
[12] you talking about the 2004-2005 period?
[13]       MR. HOFFMAN: Pre that. Before that.
[14]       THE COURT: You mean --
[15]       MR. HOFFMAN: -- in other words, he testified that
[16] there were numerous changes over the years, and I am just going
[17] into what some of those changes were.
[18]       MR. BRAUN: I have one more objection to that.
[19]       My first objection that, without hearing a time
[20] period, the witness's answer might be misleading,
[21] cross-examination.
[22]       THE COURT: On the 18-year time period before the
[23] enactment of the '04 program is, in our view irrelevant.
[24] Nothing happened during that time.
[25]       MR. HOFFMAN: It is our position that it is very

Page 88

[1] relevant because this is a lawyer who was involved in the
[2] immigration filings for many, many, many, many years. And one
[3] of the questions is many of these lawyers, including my client,
[4] were constantly being bombarded with different changes. And
[5] one of the defenses is, one of the things that they hoped to
[6] achieve was that during the time period, if they filed an
[7] application, and the person got a work permit, person got a
[8] travel permit, that even if they weren't specifically eligible
[9] at that moment in time, six months later they might be. So if
[10] they could be kept in the United States with permits, they're
[11] eligibility could change. That's the reason.
[12]       THE COURT: I am totally confused. We are talking
[13] about a period 2004-2005. We got a program that was initiated
[14] in 1986, right?
[15]       MR. HOFFMAN: Yes.
[16]       THE COURT: Are you suggesting that during that entire
[17] period of time, that people are applying for amnesty?
[18]       MR. HOFFMAN: They were.
[19]       MR. BRAUN: I don't think that's correct. It went
[20] from '86 to '88, and it changed, and litigation, and you had
[21] windows that opened up from time to time. It is not a
[22] continuous 18-year period.
[23]       If Mr. Hoffman wants to try and establish that this
[24] witness, that there are sometimes changes in the immigration
[25] law, that sometimes people become eligible for amnesty, that

Page 89

[1] weren't eligible. I suppose we have no objection to that -- to
[2] go into 18-year period all of the changes that took place, is
[3] not at all necessary to establish the basic proposition, that
[4] the law can change and that people who aren't eligible at one
[5] point can become eligible later on.
[6]       THE COURT: When did Mr. Gupta start doing immigration
[7] law?
[8]       MR. HOFFMAN: Long time ago. I don't know the exact
[9] date, but I could find out. Not '84 to '85. Maybe 15, 20
[10] years before.
[11]       THE COURT: 15, 20 years before -- before 1985?
[12]       MR. HOFFMAN: Correct. You want me to ask?
[13]       THE COURT: No.
[14]       MR. BRAUN: So he's been doing it since the '70s? 15,
[15] 20 years before today?
[16]       MR. HOFFMAN: Before 2004.
[17]       MR. RENZIN: Okay.
[18]       MR. HOFFMAN: Did I misspeak?
[19]       MR. BRAUN: We understood you to say 15 to 20 years
[20] before 1985.
[21]       MR. HOFFMAN: I'm sorry, before '04.
[22]       THE COURT: Okay.
[23]       MR. HOFFMAN: So the direct examination asked
[24] questions about when it came in, and touched on the various
[25] changes that he covered.

Page 90

[1] MR. BRAUN: No. We said -- we asked him questions
[2] about '86 to '88. Now we said, is there a window that had
[3] opened up in '04, and what were the requirements of that
[4] period.
[5] THE COURT: I think that that's accurate.
[6] I have another question. Mr. Braun objected as to
[7] foundation when you were asking the agent whether there was
[8] then confusion. Did he actually -- he never worked with
[9] people.
[10] MR. BRAUN: That was my objection. He said it was
[11] confusion among applicants. To our knowledge, the witness had
[12] no inner action with applicants.
[13] He's answered there was a lot of confusion. Probably
[14] means just out in general at the agency.
[15] I think he's, perhaps, speculating on applicants.
[16] Makes sense to him probably that there would have been
[17] confusion. But I don't think he said inner action with that,
[18] that was my concern
[19] THE COURT: I don't want you going into a period of
[20] time that is not relevant.
[21] You have already established that there were many
[22] changes. So why are we going into it any further than that
[23] MR. HOFFMAN: Because they went through the
[24] applications that require the applicant to say I left the
[25] country.

Page 91

[1] (In open court)
[2] Ladies and gentlemen, we are going to take our morning
[3] recess. As you know, please do not think about or discuss the
[4] case. And we will come and get you in approximately ten
[5] minutes.
[6] (The jury left the courtroom)
[7] THE COURT: You may return to your seats.
[8] MR. RENZIN: Should the witness remain, your Honor, or
[9] may he step out?
[10] THE COURT: You may step down.
[11] MR. RENZIN: One point that may help clarify.
[12] All the witness testified to is that during the
[13] relevant period, which is 2004 -- May 2004 to December 2005,
[14] there were certain requirements. Those are the only
[15] requirements that are at issue. Whether or not -- the issue in
[16] this case is whether or not Mr. Gupta's clients submitted
[17] applications that falsely satisfied those requirements.
[18] The requirements are clear as of the time that the
[19] applications were put in.
[20] Whether or not there was confusion before, whether or
[21] not there was hope that there was some change later, we are
[22] talking about a specific window with specific requirements.
[23] And the only -- requirements -- and in taking him through the
[24] form was to simply show how, where the requirements on the form
[25] are reflected.

Page 92

[1] THE COURT: Mr. Hoffman.
[2] MR. HOFFMAN: The government's position is as just
[3] stated, that the requirements are clear. That's the
[4] government's position.
[5] Our position is that they're not so clear because
[6] there were many, many changes over various periods of time.
[7] And there was a lot of confusion by applicants and lawyers in
[8] terms of what they were putting forth.
[9] THE COURT: Let me ask you something, just sticking
[10] with the documents, for instance, a lawyer filling out a
[11] document, I believe one of the documents toward the end said
[12] that I know personally that I do it under perjury. So the
[13] question is, what does the lawyer know?
[14] Are you saying that the lawyer swore that he knew
[15] personally, because information was presented, but he didn't?
[16] I can't really see how confusion comes in when it is a
[17] question of filling out forms. They either have the
[18] application requirements at the time they fill it out or they
[19] don't.
[20] MR. HOFFMAN: I will give you an example.
[21] In one of the series of questions to this witness, the
[22] witness testified the forms changed. At one point in time the
[23] form said, that was signed by the preparer, did not say under
[24] penalty of perjury.
[25] THE COURT: Did it say under penalty of perjury from

Page 93

[1] May 2004 through December 2005?
[2] MR. HOFFMAN: No.
[3] MR. RENZIN: It changed during that period.
[4] MR. BRAUN: Let me explain what actually changed.
[5] The applicant start -- during the relevant time
[6] period, start to finish, signed the same application under
[7] penalty of perjury. Where the preparer, such as Mr. Gupta,
[8] signed there was a certification. The wording in that
[9] certification changed during this window.
[10] In the first instance, the witness described both
[11] certifications, they changed the wording of it, your Honor.
[12] In the most recent version of it, which the witness
[13] actually read to the jury, the preparer said, I declare under
[14] penalty of perjury that I prepared it.
[15] It further stated the responses, or the information
[16] contained on this application are based on information that I
[17] know to be true and/or that the applicant provided to me, based
[18] on responses to the exact questions posed on the application.
[19] That's not a change in criterion, that is not a change
[20] in eligibility, it is not about the who qualified during what
[21] period of time. It is simply a rewording of the preparer's
[22] certification.
[23] THE COURT: Mr. Hoffman, let me have your example
[24] again.
[25] MR. HOFFMAN: Let me just add, start this way, the